## WALLACE *v*. BERNHEIM.

### Opinion delivered October 17, 1896.

EVIDENCE—ACCOUNT BOOKS.—In the trial of an intervention in an attachment suit, where the intervener claims that there was a conspiracy between plaintiff and defendant to defraud the latter's creditors, he may read in evidence the account of plaintiff against defendant kept in the former's book of accounts, although some of the items were entered thereon prior to the conspiracy.

SAME—FRAUDULENT DESIGN.—Interveners in an attachment suit, seeking to postpone or defeat plaintiff's prior lien, may prove that defendant had formed the design to cheat his creditors, and that he was making active preparations to carry such design into effect when plaintiff sold the last bill of goods to him, if they further show that plaintiff entered into this scheme with defendant, and undertook to carry it out by the means alleged in the petition of intervention.

SAME—ADMISSIBILITY OF LETTERS.—Letters written by interveners in an attachment suit to a bank demanding payment of a check drawn on it by the attachment defendant in favor of interveners, together with the letters of the bank refusing payment, are admissible to show that the check was not paid.

WITNESSES—INTERROGATION—LEADING QUESTIONS.—It is in the discretion of the trial court to permit a party to ask his own witnesses leading questions.

FRAUD—INTENT TO ATTACH.—The mere fact that a seller of goods on credit at the time of the sale intended to attach for the purchase money if not paid when due does not render the debt fraudulent. Nor does the fact that an attachment plaintiff intends some benefit to himself from his attachment, or that the debtor's business may be broken up and destroyed, render the attachment fraudulent as to other creditors.

TRIAL—MISLEADING INSTRUCTION.—The instruction that a debt created with a view of suing out an attachment and thereby breaking up and destroying the debtor's business for the purpose of delaying other creditors is fraudulent as to the latter is misleading where the only issue is whether or not the attaching creditor intends to aid the debtor to defraud other creditors.

Appeal from Sebastian Circuit Court, Greenwood District.

EDGAR E. BRYANT, Judge.

### STATEMENT BY THE COURT.

Bernheim Brothers filed a petition of intervention in an attachment suit brought by M. C. Wallace against George Aitken. Aitken was engaged in the saloon business at Huntington, Sebastian County, Arkansas, and purchased liquors of M. C. Wallace, of Fort Smith, and of the interveners, and was indebted to both of said parties. Wallace testified that, on the 8th day of May, he sold to Aitken five barrels of whiskey, for which Aitken agreed to pay him, upon demand, five hundred dollars. He said that, at the time he sold Aitken this whiskey, Aitken owed him about seven hundred dollars, in addition to the price of the five barrels. He further testified that, after he had shipped the whiskey to Aitken, he heard that Aitken had been trying to sell his stock of goods, and, being apprehensive that he might lose his debt, he took steps to attach Aitken. He went to Huntington on the 10th of May, and demanded payment of the five hundred dollars agreed to be paid for the whiskey. Not being paid, he brought suit, and attached Aitken's stock of goods, including the five barrels of whiskey shipped by him, which had not yet been delivered by the railway company to Aitken. Bernheim Brothers also brought suit by attachment against Aitken, and filed a petition of intervention in the suit brought by Wallace. Among other things, they alleged that, "at the time of the suit and the attachment of the said M. C. Wallace herein against the defendant, Geo. Aitken, no ground of attachment existed against him, and that said attachment was sued out and levied at the instance and request of the said George Aitken, under a collusive agreement and understanding previously had,

that the plaintiff should first pretend to sell said Aitken a large amount of goods, and sue therefor, and cause an attachment to be issued and levied on the property of the defendant, and that the same should be sold at a sacrifice, and be bought in by the said plaintiff, M. C. Wallace, for the purpose of hindering these defendants and others in the collection of their debts; and that the defendant George Aitken, under and in pursuance of said collusive agreement, was to have and realize some benefit as one of the results and objects of said collusive agreement, as aforesaid." Wherefore they prayed that the attachment lien of said Wallace be postponed to the lien of petitioners.

Aitken made no defense to either attachment suit. Both parties took judgment against him, and both attachments were sustained. On the trial of the intervening petition, the circuit judge, at the request of interveners, gave instruction No. 2 as follows:

"2. The court instructs the jury that a debt created with a view, at the time the debt is contracted, of suing out an attachment, and thereby breaking up and destroying the vendee's business, for the purpose of either securing some benefit to the creditors, or for the purpose of delaying, hindering, or defrauding other creditors, is fraudulent as to the latter; and, if you find that any portion of Wallace's debt was created in that way, you must find for the interpleader."

In addition to other instructions, the court also gave, on his own motion, instructions Nos. 3 and 7, as follows:

"3. So in this case the issue is simply reduced to the query, was Wallace's debt *bona fide*, or was it, in whole or in part, fraudulent? Upon this issue the evidence in the record presents two questions: (1) Was any part of Wallace's debt, on which suit was brought, paid off, and no credit given therefor? (2) Was any of

it contracted by Wallace with the intention at the time such part was contracted to attach on the debt? If the affirmative of either of these propositions existed, the debt was fraudulent."

"7. The second proposition is that if any part of Wallace's debt was contracted with the specific purpose in view of running this attachment, the debt is fraudulent. Of course, a person may sell to a debtor with a general purpose of securing himself by attachment, if it should become necessary, but he must not sell with the specific intention and purpose in view at the time of the sale of running an attachment that would absorb the debtor's property to the exclusion or detriment of other creditors. This proposition in this case arises on the items in Wallace's claim sold to Aitken on May 8th or 9th, 1893. If, when Wallace sold these items to Aitken, he intended to run this attachment, it was fraud, and renders the whole debt fraudulent. But if he sold the articles straight out, in the usual course of business, without any purpose at the time of the sale of running this attachment, but conceived the intention of attaching after the sale, no matter how short a time thereafter, there would be no fraud in the transaction. This question turns on the intention in the mind of Wallace at the time the items were sold to Aitken. If at that time he intended to run this attachment, whether by collusion with Aitken or on his own accord, the debt was fraudulent, and the attachment cannot stand. But if he sold the items honestly, with no intention at that time of attaching, there was no fraud in the transaction, and in such case it is immaterial how short a time elapsed before he conceived the idea of attaching, nor was he obliged to take back the goods, for, if honestly sold, he had the right to rely on the debt therefor, and to secure himself by attachment,

even if he attach with the understanding with Aitken that he will not contest it."

There was a verdict and judgment in favor of interveners.   The other facts sufficiently appear in the opinion.

*Winchester & Martin* and *S. R. Cockrill* for appellant.

1.   The court erred in the admission of evidence. The ledger of Wallace showing transactions with Aitken & Evans, and continuing down in the name of Aitken, to March 21, 1893, was improperly admitted. Bump, Fr. Conv. (3 Ed.), 385.   They were not declarations or acts which occurred while on the prosecution of the common design to defraud.   20 Ark. 225; 50 *id*. 287. Only acts and declarations of the parties while engaged in the furtherance of the common design to defraud are admissible.   Stephen's Dig. Ev. 10; Bump, Fr. Conv. (3 Ed.), 587; 20 Ark. 225.   The evidence of Handlin as to Aitken's check, and the check itself, were not admissible.   They were transactions of Aitken with appellees in the absence of Wallace.   So was the account of Aitken with the First National Bank.   All these were irrelevant, because not made in pursuance of the conspiracy; because they were had in appellant's absence; and because no connection or knowledge is shown on the part of Wallace with Aitken's fraudulent purposes, if they existed at that time.   Testimony of this character is not admissible to prove a conspiracy.   Bump. Fr. Conv. 586; 1 Gr. Ev. (14 Ed.), sec. 111.   It was error to allow Aitken to testify as to his fraudulent intentions, etc., because, no matter how corrupt Aitken might have been, unless he acquainted Wallace with them, and Wallace became a party to them, Aitken's frauds could in no wise bind him.   46 Mich. 268.   It was also error to allow Aitken's testimony as to purchase of seven barrels

of whiskey from appellee's agent and as to $100 he gave him together with the $300 check. Conversations had by Aitken in the absence of appellant are irrelevant, and not competent; for it is only after a confederation has been established that such declarations of a conspirator are allowed, and then only while engaged in the prosecution of the purpose for which they had confederated. Bump, Fr. Conv. 584; 40 N. Y. 221; 33 Barb. 165. The same objections apply to the other testimony admitted over appellant's objections. 18 Ark. 124; 9 *id.* 92; 5 *id.* 13; 45 *id.* 135; Bump, Fr. Conv. 587.

2. The court's charge was erroneous. It is not necessary to set out all the evidence for the purpose of determining whether the charge is right or wrong. That could be determined without any evidence at all. 44 Ark. 74; 15 *id.* 118. The most obvious errors in the charge relate to fraud in contracting the debt. The court told the jury that appellant's prior attachment was void, if the appellant entertained the design of suing out an attachment at the time any part of his debt was contracted. This was repeated in several forms. Such is not the law. 60 Ga. 669; 53 Ark. 327; Bishop, Ins. Debtors, sec. 203; 58 Ark. 293; 104 N. Y. 297; 123 U. S. 436; 47 Ark. 48. The error was repeated, but never corrected. 32 S. W. 500. In the fourth given by the court on its own motion the jury are told that, in order to find for appellant, they must find that his debt was "all honestly *contracted in the usual course of business.*" Again, in the ninth the court makes it a condition to finding in appellant's favor that he should have sold the goods "straight out, in the usual course of business." If the goods were actually sold, and the price had not been paid, it was a matter of no concern to the appellees, who were only second attachers, whether, as between Aitken and appellant, it was a "straight out" or some other sort of a sale; or whether

the sales, as between the parties, was honest or dishonest.    47 Ark. 48.

3.  *Withholding credits of payments.*    The third and ninth, on the court's own motion on this subject, leave out of consideration the creditor's intent to commit a fraud.    If the suit was inadvertently for more than was due, it would not avoid the attachment.    7 Cush. (Mass.), 587.    It was error to make the question of fraud depend solely on the fact whether a payment by the debtor had not been credited.    That was to be considered with the other facts and circumstances.    It was error to isolate that fact, and make the result depend on it alone.    57 Ark. 569.    But even if any item of the debt had been paid, it would not have avoided the whole attachment in favor of a subsequent attacher.    39 Ark. 325; 59 *id.* 280; 50 N. W. 966.    There is another reason why interveners cannot set the attachment aside, except so far as it is actually void.    When the case was tried, judgment had already been rendered against Aitken, and the attachment sustained.    No relief could be granted in such a case until it was established that a defense existed.    50 Ark. 458, 463; 12 *id.* 401; 110 U. S. 184; 47 Ark. 42; 15 Conn. 504.

4.  The errors in the admission of testimony were aggravated by the eighth and ninth instructions.    See 49 Ark. 148, 153; *ib.* 459; 34 *id.* 696; 45 *id.* 166.    It is not the duty of the judge to point out what inference *may* or should *be drawn* from particular facts in proof. 49 Ark. 148, 153.

*John H. Rogers* for appellee ; *John S. Little* and *Smith & Brewster* of counsel.

1.  The bill of exceptions does not purport to contain all the evidence.    44 Ark. 76; 46 *id.* 69; 49 *id.* 364; 36 *id.* 496; 38 *id.* 102; 7 *id.* 348; 9 *id.* 478; 15 *id.* 118; 54 *id.* 159.

2. All testimony tending to show the financial status of Aitken prior to the attachment is clearly admissible. ' 59 Ark. 305. The *bona fides* or existence of Wallace's debt was assailed as fictitious, simulated. That was the main inquiry, and Wallace's books and all the other testimony bearing on the state of the account between Wallace and Aitken, before and after the attachment, was clearly admissible as tending to show : (*a*) Whether there was a collusive scheme, and the intent. (*b*) A continuation of the conspiracy after the sale. (*c*) The relations of the parties, socially and in business matters, throwing light on the conspiracy and the intention of the parties. Bump, Fr. Conv. sec. 590; 50 Ark. 287; 20 *id*. 225; 35 Maine, 509. Slight circumstances, when connected with other evidence, may become very important. 10 Ark. 429; 46 Ark. 49.

3. The mortgage on its face was fraudulent as to creditors. 46 Ark. 129. That fact alone made it admissible.

4. The conspiracy did not end, as long as the mortgaged goods continued in existence, and the acts and declarations of Aitken in reference to them were evidence against Wallace. 22 Ark. 225; 59 *id*. 305.

5. The conspiracy began before Bernheim sold the large bill on April 11, 1893. Young's debt was taken up in self-defense. It was an incident essential to the success of the scheme.

6. The letters between Aitken and the bank and the bank and interveners were competent. They were all written pending the conspiracy. If the facts and circumstances within Wallace's knowledge at the time he sold the last bill of goods was sufficient to put a man of common sagacity upon inquiry, and with the use of reasonable diligence he could have discovered Aitken's fraudulent purpose to swindle his creditors, and he neglected to make the inquiry, he is chargeable with notice,

and the principle applies to all the facts he might have ascertained by inquiry at the bank where he knew Aitken was doing business, and where he knew Aitken's check had been protested. 50 Ark. 320; 11 Fed. 561. In matters of fraud, whatever characterizes the conduct of the parties, and the transaction, is competent. 59 Ark. 263; *ib.* 612.

7. Fraud can only be proved by circumstances. 55 Am. Dec. 503.

8. Leading questions are matters within the discretion of the court. The testimony of Patterson and Dunn, so far as they proved what Wallace said and did, was admissible. 58 Ark. 446; *ib.* 125; 32 S. W. 1030; 32 *id.* 67, 717, 815, 168.

9. Where the issue is fraud, great latitude is allowed in proof of circumstances. 9 Conn. 52; 3 Rice on Ev. p. 77; 1 *id.* ch. 12. It is always competent to show what precedes and follows the transfer, the relations of the parties, prior and subsequent, and all the circumstances surrounding. Bump, Fr. Conv. (3 Ed.), 585, 590; 104 N. Y. 305; 59 Ark. 305.

10. The instructions are correct. The main instructions complained of is the second paragraph of instruction three. This must be considered in connection with the second paragraph of the fourth, and with the seventh, and also with the second and fourth asked by interveners. Taking these together, there is no error, and the jury were not misled. Elliott, App. Pro., sec. 648; Thompson, Charging the Jury, par. 131, etc. They clearly state the law. 14 So. 485.

11. A conveyance which places a debtor's property beyond reach of creditors by *legal process*, and at the same time creates a trust in the property for his own use, is void. 6 Hill, 438; 5 Cow. 547-8; Bish. Ins. Debt. secs. 181-3. An assignment to pay a fictitious debt is fraudulent because it hinders and defrauds creditors.

Bish. on Ins. Debt. sec. 212; Wait, Fr. Conv. sec. 345; 2 Sandf. Ch. 594; 1 Sandf. Ch. 83.

12. The assailed instructions were entirely applicable to the case presented. They cannot be attacked by culling a sentence here and there, and considering them separately. Elliott, App. Pro. sec. 648; 12 U. S. App. 482; 10 U. S. App. 375; ib. 629.

13. The sale of May 8, 1891, was not a sale at all; it was a fictitious sale, vitiated by collusion and fraud. It was not like 104 N. Y. 297. The fraud in this case cannot be sheltered behind an attachment, or a subsequent judgment. 47 Am. Dec. 409.

14. The fraudulent part of the debt made the whole attachment fraudulent. 57 Ark. 545; 53 id. 140; 54 Fed. 94; 12 Pick. 389.

15. If it was the duty of the court to instruct the jury "to give interveners precedence only to the extent they might find that Wallace's debt was paid," appellant cannot complain. He asked no such instruction. 2 Pet. 1–15; 8 Wall. 342, 353–4; 15 id. 151, 164; 151 U. S. 73. This court corrects only errors complained of in the court below. 27 Ark. 306; 37 id. 159; 55 id. 548; 12 U. S. App. 482; 8 U. S. App. 120; 32 S. W. 559, 855.

16. A creditor cannot collude with an insolvent debtor, either by agreement or by legal proceedings, to convey the debtor's property to the creditor, in order that the debtor shall derive a benefit therefrom, to the injury of other creditors. 123 U. S. 441; 6 Wall. 78; 2 Pick. 129; Bish. Ins. Debt. secs. 181–3.

17. The judgment is right, upon the whole record, and should be affirmed, harmless errors notwithstanding. 10 Ark. 53; 26 id. 322; 26 id. 410; 19 id. 96; 66 Fed. 887; 46 Ark. 485; ib. 542; 28 id. 59; 43 id. 296; 44 id. 556; 57 id. 242.

RIDDICK, J., (after stating the facts.) The questions in this case arise upon a petition of intervention

filed in an attachment suit. The interveners, Bernheim Brothers, contend that the attachment suit brought by Wallace against Aitken was the result of a secret and fraudulent agreement between Wallace and Aitken for the purpose of defrauding interveners and other creditors of said Aitken.

<span style="float:left">Admissibility of account books in evidence.</span> In order to prove the allegations of their petition, interveners introduced evidence to show certain transactions between Aitken and Wallace, and the circumstances surrounding the same. Many objections were made, and many exceptions saved, to the introduction of this evidence, but none of these exceptions can be sustained. It was certainly not erroneous for interveners to read in evidence the account against Aitken, kept by Wallace upon his book of accounts, and showing the different transactions between himself and Aitken. That some of the items of this account were entered upon the books prior to the conspiracy alleged to have been entered into between Wallace and Aitken is of no consequence, for these entries are not the acts or declarations of another conspirator, but of Wallace himself. It was important to show the state of the account between Wallace and Aitken, and it was proper, as against Wallace, to show this by his own books; the rule being that the declarations of a party to the record, whether oral or written, are, as against such party, admissible in evidence. 1 Greenleaf, Ev. (Redfield's Ed.), sec. 17.

<span style="float:left">Admissibility of evidence of fraudulent design.</span> It was proper to admit evidence to show that Aitken had formed the design to cheat his creditors, and that he was, at the time Wallace sold the last bill of goods to him, making active preparations to carry such design into effect. But, in order to affect Wallace, it was necessary to go further, and show that he entered into this scheme with Aitken, and undertook to carry it out by the means alleged in the petition of interveners.

There was no case to submit to the jury until some evidence was introduced tending to show such connection of Wallace with the fraud of Aitken. If Aitken formed the design of cheating his creditors, and Wallace afterwards became a party to this design, and undertook to aid him to carry it into effect, then the acts and declarations of Aitken done in pursuance of this purpose are competent evidence against Wallace, even though they were prior to the entry of Wallace into the conspiracy. "Every one," says Mr. Greenleaf, "who does enter into a common purpose or design is generally deemed, in law, a party to every act which had before been done by the others, and a party to every act which may afterwards be done by any of the others in furtherance of such common design." 1 Greenleaf, Ev. sec. 111. If this were not so, it would, in many cases, be impossible to show the full scope of the conspiracy. *Cox* v. *Vise*, 50 Ark. 287. The evidence tending to show that Wallace entered into a conspiracy with Aitken to defraud his creditors may not be very satisfactory, but it was sufficient, we think, to submit to the jury.

The court, over the objections of appellant, permitted the interveners to read in evidence letters written by them to a bank in Fort Smith demanding payment of a check drawn by Aitken upon the bank in favor of interveners; also letters written by the bank in reply, refusing to pay such checks. It is contended that it was error to admit such letters. As the bank was not a party to the action, it would not, as a rule, be competent to prove facts against Wallace by the declarations of the bank officials, whether contained in letters or not. Nor could such facts be established by the letters of interveners. But the only object in introducing these letters was to show that the check of Aitken was not paid. It was proper to show this, and, as the presentment of the check for payment and the refusal of the

When letters admissible.

bank were each made by letter, it was competent to introduce these letters to show such facts. The letter of the interveners was in itself a demand for payment, and the letter of the bank was a refusal to pay, and they were the direct evidence of such facts. 1 Greenleaf, Ev. sec. 101.

<span style="float:left">Examination of witnesses.</span> It is further said that interveners were allowed to put leading questions to their own witnesses. While the general rule is that a party should not be allowed to put questions to his own witness that suggest the answer desired, still there are exceptions to this rule, and the question of when a party should be allowed such a privilege rests largely in the discretion of the presiding judge. Some latitude in this direction may have been permitted in this case, but nothing to justify a reversal on that ground.

<span style="float:left">Whether intent to attach fraudulent.</span> Without discussing further the points raised on the admission of evidence, we will say that no material error was committed in that regard, but we are of opinion that the presiding judge erred in his charge to the jury. It will be seen, by reference to instructions three and seven set out in the statement of facts, that the learned judge instructed the jury that if Wallace, at the time he sold any portion of the goods charged in the account on which he brought suit, intended to attach for such debt, then his debt was fraudulent, and the finding should be in favor of interveners. We have been cited to no case that supports this doctrine, and it does not seem to be supported by sound reason. A creditor has the right to sue upon his debt if not paid when it falls due. If, at the time the debt is contracted, he intends to bring suit so soon as it falls due, this intention cannot make his debt fraudulent, for he intends no more than the law permits him to do; in other words, he intends only that which is lawful. If he forms the intention at the time the debt is contracted not only to

sue, but to attach the property of his debtor, this intention cannot be said, as a matter of law, to be fraudulent, for the law permits the creditor to attach under certain circumstances, and his intention to attach may be perfectly lawful. Take this case as an illustration. If Wallace, at the time he sold the last item of goods to Aitken, had learned that Aitken ·was about to transfer his property, with the intention of defrauding his creditors, and, therefore, at that time formed the intention of attaching unless his debt was paid upon demand, would this be anything more than the law allowed him to do,· and can it be fraudulent to resolve to do that which is lawful? We do not think so. On the contrary, we hold that an intention to attach for the collection of a *bona fide* debt cannot, as a matter of law, be said to be fraudulent, although such intention be formed at the time the debt was contracted. But, under the instructions above mentioned, however honest the motive of Wallace may have been in forming the intention to attach, yet if such intention was formed at the time the debt, or any part thereof, was contracted, the jury was compelled to find for interveners.

It may be conceded that very few merchants would sell on time to one whom they knew was disposing of his property to defraud his creditors, and when they knew it would be necessary to attach. A sale under such circumstances, and with the intention on the part of the seller to attach, might, if unexplained, tend to show fraud, but that is a question of fact, which must be left to the jury, or, at least, decided by the weight of evidence, and not as a matter of law.

We are also of opinion that instruction No. 2, given on motion of interveners, was subject to objection. The fraud alleged against Wallace was the result of collusion between himself and Aitken; but this instruction leaves out the question of collusion between Wallace and

Aitken; leaves out the question as to whether Wallace intentionally brought suit for more than was due him, with the view of aiding Aitken, and makes the case turn on the question whether the debt sued upon was contracted by Wallace with the view of suing out an attachment for the purpose of destroying the business of Aitken, and thereby securing some benefit to himself. It is not claimed by interveners that there was any malice on the part of Wallace against Aitken, or that he desired or intended to destroy the business of Aitken. On the contrary, the contention of interveners is that the intention of Wallace was to assist Aitken at the expense of his other creditors. For these reasons, this instruction was calculated to confuse and mislead the jury, and should not have been given. Nor is it clear that such instruction, if abstractly considered, could be held correct. We have already stated our reasons for holding that fraud cannot be predicated, as a matter of law, upon the sole fact that a party sells goods with the intention to attach for the price. Neither can it be said, in law, to be fraudulent for a creditor to intend some benefit to himself by his attachment, for it is the rare exception that an attachment is procured by one who expects no benefit therefrom. This reference to the destruction of the debtor's business had a tendency to mislead the jury. Persons who are perfectly solvent are rarely attached. It is against those who are tottering on the brink of insolvency that this process is usually directed. Hence the destruction of a debtor's business, or at least the cessation thereof, is a frequent result of attachment suits begun in the utmost good faith. It is therefore no evidence of fraud on the part of a creditor that the misfortune to the debtor is caused by the attachment. But we may go further, and say that if a creditor, having a *bona fide debt*, brings an attachment suit, actually intending, by that means, to

destroy the business of the debtor, and to make a benefit thereby, yet it is doubtful if such intention, although indefensible as a matter of morals, can be said, in the absence of collusion, to be fraudulent as a matter of law; for if there be no grounds for the attachment, the debtor can resist and defeat the attempt to destroy his business. If there be just grounds for the attachment, it can only result in the public sale of the goods attached. Other creditors and the public generally have the right to bid at such sale, and may compel the purchasers to pay a fair price for the same. So long as there is is no collusion on the part of the debtor, other creditors have no right to complain that a creditor, who attaches for an honest debt, intends, not only to collect his debt, but to injure his debtor. Against such an intention the debtor and his other creditors can protect themselves, but the case is different when the debtor colludes with the attaching creditor for the injury of his other creditors. For these reasons, it is doubtful if this instruction is correct, abstractly considered; but, as there is no contention that Wallace desired to injure Aitken or break up his business, such an instruction, even if correct, was in this case unnecessary and misleading.

The contention of interveners is set out in the allegation that the suit and attachment commenced by Wallace was, by collusion, purposely brought for a larger sum than was due, with the intent to aid Aitken to hinder and delay interveners and other creditors of Aitken in the collection of their debts. To support this allegation, the interveners undertake to show that a check for $300.00, drawn by Aitken in favor of Wallace, was given in part payment of the debt of Aitken to Wallace, and also that the sale of five barrels of whiskey made to Aitken by Wallace was only a sham sale to increase apparently the debt from Aitken to Wallace, so that the attachment might absorb the whole property of

Aitken. Wallace testified that this check was not given to him as a payment upon his account, but that, the bank upon which the check was drawn having closed for the day, he had, in order to accommodate Aitken, exchanged cash for the check. He also testified that the sale of the five barrels of whiskey was in every respect *bona fide.* If the check for $300.00 was given to Wallace upon his account, and not in exchange for cash, then he should have given credit for it. If he purposely withheld credit for the same, and intentionally brought suit, attached, and took judgment for $300.00 more than was due him, he was guilty of a fraud which would justify a finding in favor of interveners. If the transfer of the five barrels of whiskey was only a pretended sale, made by collusion, for the purpose of apparently increasing the debt due Wallace, that the attachment might absorb the whole assets of Aitken, then the attachment for the price of this pretended sale was fraudulent, and justified a judgment giving precedence to the attachment lien of interveners. But the instructions do not confine the jury to the issues presented by the pleadings.

When instruction misleading. The question presented by the pleadings was whether Wallace, by collusion with Aitken, brought suit and attached for more than was due him, with the intent to aid Aitken in putting his property beyond the reach of his creditors, and this is the question that should have been presented to the jury. But the instructions complained of left out the question presented by the pleadings, and permitted the jury to decide the case on other issues.

These instructions, we think, were erroneous and prejudicial. The judgment is therefore reversed, and the case remanded for a new trial.

BUNN, C. J., (dissenting.) The judgment of the trial court in this case would be affirmed were it not

that a majority of this court discover error in the seventh instruction given to the jury on the court's own motion, and over the objection of the plaintiff. That instruction is as follows : "The second proposition is that if any part of Wallace's debt was contracted with the specific purpose in view of running the attachment, the debt is fraudulent. Of course, a person may sell to a debtor with a general purpose of securing himself by attachment if it should become necessary; but he must not sell with the specific intention and purpose in view, at the time of the sale, of running an attachment that would absorb the debtor's property, to the exclusion or detriment of other creditors."

It is announced substantially by the court, in its opinion in this case, that it is not fraud against other creditors for one creditor to contract a debt against the common debtor, having the specific intention at the time of attaching his property to secure his debt, if the same is not promptly paid when due. There never was a sounder doctrine than that in the abstract, but is it so in this particular case? In selling a piece of property to another, I may have in my mind the intention to sue him, or to recover and secure my debt in any or all of the ways known to the law, should he fail to pay when the debt is due ; and certainly there is no fraud in such intention. That is a plain case. But that rule is not applicable to a case, where the intention is to do something more than to assert and secure one's rights. In the instruction under consideration, the trial court said, that it is a fraud for one to contract a debt with the specific intention at the time "*to run an attachment that would absorb the debtor's property, to the exclusion or detriment of other creditors.*" And whatever may be the want of explicitness, or the inappropriateness, of the language of the remaining portion of the instruction complained of (for it seems to be only explanatory of the first part), the

language we have quoted is so plain and concise that the jury could not but understand exactly what the court meant in the whole of the instruction.

If we were disposed to be critical, we would perhaps say that the phrase "to the exclusion of" was not strictly expressive of the idea evidently intended to be expressed,—not so good as the alternative phrase "to the detriment of" just following it; but, taking it in connection with the subject matter of all the instructions, the simple, well-understood meaning of the court was that, for Wallace to contract his debt, or any part thereof, with the specific intention of absorbing the debtor's property, so as to exclude other creditors from the assertion and maintenance of their rights, was fraudulent. If this be true, the contraction of the debt was certainly a fraud upon the rights of other creditors. That certainly was the idea intended to be expressed by the court, and was evidently the sense in which the jury received the instruction, taken in connection with the other instructions. Wallace claimed that Aitken owed him about $800 previous to the sale of the five barrels of whiskey on the 8th of May, 1893, and the five barrels were sold for about $500. Wallace disclaims, inferentially, all intention of attaching Aitken at the time he sold the five barrels. He testifies that he attached Aitken on receiving information at Huntington, on the day of the attachment, or about that time, that Aitken had been secretly endeavoring to sell to another party.

Wallace attached on his debt of $1300, and afterwards bought up the claim of another small attacher, so that his claim with all interests, etc., added, amounted to $1550. With Aitken's assent, he procured an order from the judge in vacation to sell the goods, as being of a perishable nature, and likely to greatly deteriorate if kept on hand. When it is kept in mind, that the goods consisted of nothing else but whiskey and other liquors

(nothing else of consequence), the application to sell at once, to avoid loss, is rather remarkable, since it is thought among connoisseurs that age adds much to the value of such goods. Besides, there is no intimation of waste or leakage, or that storage amounted to much. His order required the sheriff to sell on five days' notice and interveners' attachment was run on the very day of sale, I think. It would have been, perhaps, earlier, but the attachers were far away, and could not have heard of plaintiff's proceedings any sooner. Wallace bought all the goods at the sale for $1550, the amount he claimed was then owing him by Aitken, and immediately resold to Aitken, for $2000, taking a deed of trust and note from Aitken, with some time to run, on the identical property, and set him (Aitken) up in business again.

The court gave its instructions in view of these facts, as well as of other outside facts, which cannot now be recited. The question is, was there not evidence to the effect that the last debt (the price of the five barrels of whiskey) was contracted for the specific purpose of attaching the whole of Aitken's property, not only these five barrels, but many other barrels he had purchased from interveners and others, and had not had time as yet to dispose of in the usual course of trade? And was there not evidence also to the effect that the forced and hurried sale enabled plaintiff to make, not only his debt, but an undue profit on the goods? If so, the last sale of whiskey may have been made for the specific purpose of making the undue profit; and, in the language of the court to the jury, the intention was, when the sale was made (or the jury might well have thought so) "to run the attachment, to absorb the debtor's property, to the exclusion or detriment (either one or the other) of the other creditors."

To apply the instructions to a part of the facts, it would perhaps be objectionable, as the majority of the

court says, but applying it to all the facts antecedent and subsequent to the institution of the suit, to our minds the court was substantially correct in its deliverance to the jury; and the jury could not have misunderstood the court, in the light of all the instructions, especially the fourth for interveners and the seventh given on the court's own motion.

We think the judgment should be affirmed.

WOOD, J., concurs.