PASHA, RESPONDENT, v. BOHART, APPELLANT.

(No. 3,071.)

(Submitted February 13, 1912. Decided February 24, 1912.)|

[122 Pac. 284.]

*Contracts of Sale—Credit—Breach of Condition—Evidence— "Bankable" Note—Definition—Appeal and Error—Review— Presumptions.*

Appeal and Error—Review—Presumptions.
1. On appeal from a judgment for plaintiff, every disputed fact must be *held* to have been resolved in his favor.

Sales—Credit—Breach of Condition.
2. Where property is sold and delivered on an agreement that credit will be extended if a bankable note is given as security, on nonperformance of this condition, the buyer is at once liable for the price.

Same—Credit—Performance of Condition.
3. Under an agreement to sell property on credit provided a bankable note is given as security, the note must be bankable without the payee becoming personally liable for its payment.

Same—Credit—Evidence.
4. Evidence *held* to show that a note offered by a buyer was not bankable, and hence that the seller might recover before the expiration of the term of credit.

Same—Credit—Evidence.
5. In an action by a seller who had agreed to extend credit to a buyer if he would give a bankable note as security, the former may testify that the banks of the place where both he and the buyer did business refused to buy the note offered by the buyer.

Same—Credit—"Bankable Note."
6. A bankable note is one receivable as cash by a bank, and a note that banks will not buy is not bankable, regardless of the bank's reasons for refusing to buy, or the high character of the paper.

'*Appeal from District Court, Gallatin County; W. R. C. Stewart, Judge.*

ACTION by R. J. Pasha against S. E. Bohart. From a judgment for plaintiff and an order denying a new trial, defendant appeals. Affirmed.

*Mr. John A. Luce* submitted a brief in behalf of Appellant, and argued the cause orally.

The burden was upon the plaintiff to allege and show that the defendant had not complied with the terms of sale. Before the

amount could become due or payable in any event in cash, it was necessary to show that the term of the credit had elapsed. (*Tatum* v. *Ackerman,* 148 Cal. 357, 113 Am. St. Rep. 276, 7 Ann. Cas. 541, 3 L. R. A., n. s., 908, 83 Pac. 151.)    This was a sale at auction, and in such a case the title to the property does not pass until there has been a compliance with the terms of the sale.    (4 Cyc. 1048.)    Where personal property or real property is sold at public auction and the purchaser refuses to comply with his bid, the vendor may maintain an action against him for damages. (4 Cyc. 1050.)    And he may resell the property at the bidder's risk and recover the difference between the price received at the resale and the amount bid, together with the reasonable expenses of the resale.    (4 Cyc. 1051; 3 Am. & Eng. Ency. of Law, 2d ed., 503, 504; *Mount* v. *Brown,* 33 Miss. 566, 69 Am. Dec. 362.)

No action for the purchase price for goods sold and delivered could be brought until the expiration of the credit.    Nor would the failure to give the notes be a basis for such an action.    The only action would be an action for damages.    (*Manton* v. *Gammon,* 7 Ill. App. 201; *Girard* v. *Taggart,* 5 Serg. & R. 19, 9 Am. Dec. 327; *Hall* v. *Hunter,* 4 G. Greene (Iowa), 539; *Hunneman* v. *Grafton,* 10 Met. (Mass.) 454; *Gibbs* v. *Blanchard,* 15 Mich. 292; *Crawford* v. *Avery,* 35 Miss. 205; *Dodge* v. *Waterman,* 36 N. H. 186; *Hanna* v. *Mills,* 21 Wend. (N. Y.) 90, 34 Am. Dec. 216; *Yale* v. *Coddington,* 21 Wend. (N. Y.) 175; *James* v. *Adams,* 16 W. Va. 245; *Mount* v. *Brown, supra;* *O'Connor* v. *Dingley,* 26 Cal. 12; *Allen* v. *Ford,* 19 Pick. (Mass.) 217; *Eddy* v. *Stafford,* 18 Vt. 235.)    If the condition under which the property was delivered to Bohart was that he should give a note with good security, then the contract was executory and the title did not pass.    Where title has not passed and the contract is still executory, it is usually held that the remedy by an action for damages is exclusive and that an action for the agreed price cannot be maintained.    (*Brand* v. *Henderson,* 107 Ill. 141; *Indianapolis etc. R. Co.* v. *McGuire,* 62 Ind. 140; *John Deere Plow Co.* v. *Gorman,* 9 Kan. App. 675, 59 Pac.

177; *Hallwood Cash Register Co.* v. *Lufkin,* 179 Mass. 143, 60 N. E. 473; *Tufts* v. *Weinfeld,* 88 Wis. 647, 60 N. W. 992.)

No reason appeared why Mr. Cox and Mr. Brown were not subpoenaed as witnesses. The court allowed these declarations of third parties, not supported by their oath, to be introduced, and this was the only evidence on the part of the plaintiff as to whether or not the note of Mr. Bohart was bankable. Defendant had the right to cross-examine these witnesses and to have them testify under oath. The objection should have been sustained and the evidence excluded. (*Yellowstone Park R. R. Co.* v. *Bridger Coal Co.,* 34 Mont. 545, 115 Am. St. Rep. 546, 9 Ann. Cas. 470, 87 Pac. 963; 16 Cyc. 1192–1194, and cases cited.)

*Mr. George Y. Patten,* for Respondent, submitted a brief, and argued the cause orally.

Counsel for appellant contends that respondent had the burden of showing that the note tendered by appellant was not a bankable note, and, in support thereof, cites the general rule that the party having the affirmative of an issue has the burden of proof. The rule is not applicable here. Respondent had the burden of proving the indebtedness alleged, but it was incumbent upon appellant to show that he had complied with the condition under which he was to have credit. Where the seller refuses to accept a note for the price pursuant to the terms of sale, the *onus* is on the purchaser to show that the surety should have been approved and the note accepted. (4 Cyc. 1050; *Mills* v. *Hunt,* 20 Wend. (N. Y.) 431; *Sweeney* v. *Vaughan,* 94 Tenn. 434, 29 S. W. 903.)

It is perhaps true that at common law, under the old forms, respondent's action would have been for damages for failure to give the note, under which the measure of damages would have been the contract price. In other words, the same result would have been reached as in the present action for the purchase price. (24 Am. & Eng. Ency. of Law, 1123, 1124; 35 Cyc. 528, 529.) But under our Codes, as interpreted by this

court, forms of action have been abolished, and if, upon any view, the plaintiff is entitled to relief, the pleading will be sustained. (*Raymond* v. *Blancgrass,* 36 Mont. 449, 15 L. R. A., n. s., 976, 93 Pac. 648; *Logan* v. *Billings N. Ry. Co.,* 40 Mont. 467, 107 Pac. 416; *Wheeler* v. *Harrah,* 14 Or. 325, 12 Pac. 500.)

Where goods are sold at auction on condition that the purchaser give in payment therefor an approved note, and the purchaser refuses to give the note on delivery of the goods, the auctioneer may reclaim the goods or treat the sale as an absolute one without credit, and immediately sue for the price. (*Corlies* v. *Gardner,* 2 N. Y. Sup. Ct. (2 Hall) 374.)

We recognize and concede the general rule that hearsay testimony is inadmissible. However, we contend that the testimony of cashiers Cox and Brown falls under an exception to the rule, and does not violate it, and so was properly admitted. An unsworn statement may not only furnish substantial evidence, but show relevant facts; it may constitute part of a transaction or occurrence, or it may go further and in itself achieve a legal result. For instance, testimony showing demand and refusal, denial or disclaimer cannot be said to be hearsay, although the witness is permitted to state the answer given by another person to the demand. (16 Cyc. 1189, 1192.) A case squarely in point is that of *Wallace* v. *Bernheim,* 63 Ark. 108, 37 S. W. 712. To contest the claim of an offer by a deceased party to make a settlement of an alleged debt the testimony of the son of the deceased was held to be admissible to show that his father, upon such alleged debt being mentioned to him, denied its existence. (*Passmore* v. *Passmore,* 60 Mich. 463, 27 N. W. 601.) Statements to a commercial agency to show fraud of a purchaser on credit were held to be admissible in *Cowen* v. *Bloomberg,* 69 N. J. L. 462, 55 Atl. 36. A letter of an attorney to an insurance company was held to be admissible to show denial of liability rendering proof of loss unnecessary in *Aetna Ins. Co.* v. *Fitze,* 34 Tex. Civ. App. 214, 78 S. W. 370; *Depew* v. *Depew* (Pa.), 4 Atl. 728.

MR. JUSTICE SMITH delivered the opinion of the court.

The complaint in this action alleges that on or about the tenth day of January, 1911, the plaintiff sold and delivered to the defendant at his special instance and request certain stock cattle at an agreed price of $375; that the defendant has not paid the amount or any part thereof. The answer denies each and every allegation of the complaint. The district court of Gallatin county tried the cause without a jury, and, after making findings of fact and drawing conclusions of law in writing, entered judgment for the plaintiff in accordance with the prayer of the complaint. Defendant appeals from the judgment and from an order refusing to grant a new trial.

It appears that on January 10, 1911, a so-called "combination sale" of livestock was held at a ranch in Gallatin county about five miles from the city of Bozeman. At this sale the defendant purchased fourteen head of cattle at an agreed price of $375. The advertised terms of sale were: "Ten months will be given on bankable note. Interest at 8% from date." The sale was held in the name of one Stucky, but the cattle purchased by the defendant were the property of plaintiff. After the defendant had bid in the fourteen head of cattle, he went to plaintiff, and said: "I gave my note to Mr. Overstreet [the clerk of the auction sale] signed by myself; that note is good, isn't it?" Plaintiff replied: "I don't know. If it is bankable, it is." Defendant then said: "If I get Frank [his brother] to sign it with me, that will make it bankable." And plaintiff answered: "I don't know; but, if not, you will have to see that a note is given to me that is bankable." Defendant then remarked, "I will leave the stuff here until I give you a bankable note"; and plaintiff "told him to take the stuff away if he would make it bankable"; and further said: "I am coming to town to-morrow and we will fix it up." Plaintiff also testified: "He had already made out a note to John Stucky. Mr. Overstreet had that and Mr. Overstreet made out another one to me. I took them to town with me, and took them to the butcher-shop. The old note he tore up, and I said, 'You

take this new note, and have Frank sign it with you.' He said, 'All right.' When I went back after the note, he said Frank wouldn't sign it. He said he would pay me for what cattle he had butchered, and I could take the rest back, or else take his note. I said I didn't want to do that, that we had gone to the expense of an auction sale, that he bought the cattle, and 'all I expect you to do is to settle for them in accordance with the terms of the sale.' He said the note was good, that I could sign it, that his name and mine would make it good, and I could get the money any place. I said I didn't figure I had to make it good. I wanted a good note without my signature; that his signature alone I could not get rid of at the bank. After this sale—the day before—and prior to this conversation with defendant, I went to the Commercial National Bank, and asked Mr. Cox, the cashier, if Seth Bohart with Frank signing with him on a note would be good, and he said for any reasonable amount, and I said, 'For $375?' and he said, 'Yes.' He said Seth's name alone wouldn't be good. He wouldn't consider it so. But he said that S. E. Bohart was not doing business at that bank, and he wasn't in very good touch with him. I afterward went to the National Bank of Gallatin Valley, and asked Mr. Brown, the cashier. He said he wasn't cashing paper; that it wasn't buying paper. He said that he wasn't buying paper, that he would not buy that paper, Mr. Bohart's note. I was willing to take this note at any time some person would take it off my hands. What I wanted was the money." The conversations with Cox and Brown were objected to as hearsay. Not any claim is made that there are any other banks in Bozeman.

John F. Collett testified: "I had a conversation with Bohart on the 15th of January about settlement. I said: 'We came down to see about the note.' 'Well,' he said, 'I supposed that sale was over.' I said: 'Part of it is over and part of it is not.' He said: 'The note is in here. You can have it. I can't get any other signer on it. You can sign it if you want to.' At the sale it was announced that there was no discount for cash." After

motion for a nonsuit overruled, the defendant testified: "I said to Pasha after the sale: 'It seems to me you do not want to let these cattle go on that note. What do you mean about it?' He said something about wanting a signer with me. I said: 'I don't know anyone on these grounds who would sign a note with me, or whom I could ask to sign with me. If you don't consider it good, I will leave the cattle here.' He said: 'I want a good piece of paper.' I said: 'Would Frank's name be good on that note?' and I think he said, 'Yes.' Two or three days later I saw him in town, and I said, 'I will sign the blank note if you want me to.' I signed the note and he said, 'Will you get Frank to sign that note with you?' and I said, 'I will go over and ask him.' Frank refused to sign the note, and Pasha would not accept it. He left it lying on the desk. I have been doing business in this county for five years. During that time I have borrowed money at the local banks on my note, without indorser or security. I have purchased cattle at sales, and have given notes in payment without security. I have paid all of these notes through the local banks except one. I considered that note I had signed a bankable note when I signed it and gave it to Mr. Pasha. It is true that Mr. Patten has a note given by me at a sale due last October that has not been paid. I wouldn't say I did not have a conversation with David E. Anderson on the morning of January 11, 1911, at my slaughter-house, in which I stated to him that I was expecting Mr. Pasha down there; that he wouldn't accept my note; that he claimed it wasn't a bankable note; and that I was going to kill the cheaper stuff and pay for it, and Pasha could take the higher priced stuff back. I might have said it. I killed eight of the fourteen cattle the next day. The ones I killed cost less per head than the others. I mean to say positively that I told Mr. Pasha that, unless he would take my individual note, I wouldn't take the stock. I do not want you to understand that he understood my individual note would be sufficient. I said I would try to get Frank to sign it with me. I understood that the note was acceptable with my individual name."

The court made findings, among others, as follows:

"(5) That after John Stucky informed defendant that said cattle belonged to plaintiff, and before defendant took possession of said cattle, plaintiff stated to defendant that, to obtain the credit offered at said sale, defendant must execute and deliver to plaintiff a promissory note, with surety or sureties if necessary, so that such note would be purchased by the banks at Bozeman, Montana.

"(6) That plaintiff unconditionally delivered the possession of said stock cattle purchased by defendant at said sale upon defendant's promise that he would execute and deliver to plaintiff a promissory note, with surety or sureties if necessary, so that such note would be purchased by the banks at Boseman, Montana.

"(7) That the promissory note signed by defendant individually which defendant offered to plaintiff in payment for said cattle was not a bankable note, as that term was understood by the parties at the sale, and did not comply with the promise under which defendant had obtained the possession of said cattle from plaintiff.

"(8) That defendant has failed and refused to execute and deliver to plaintiff a bankable note as that term was understood by the parties at said sale in payment for said cattle, and has not complied with the promise under which he obtained possession of said cattle from plaintiff."

1. Every question of fact in the case must be considered as [1] having been resolved in favor of the plaintiff, and his version of the conversations had between the parties must be accepted. Therefore, we must presume that the title to the cattle passed to the defendant at the time of the sale, and that the agreement was that he should have ten months in which to pay for the same, provided he could furnish a bankable note for the amount of the purchase price, and not otherwise. "When credit is given for the price of goods sold on the condition that the [2] purchaser's note, with surety, be given therefor, and this condition is not complied with, but the property is taken by the

purchaser, he is liable for the price at once, and before the expiration of the proposed term of credit.'' (*Wheeler* v. *Harrah,* 14 Or. 325, 12 Pac. 500; *Corlies* v. *Gardner,* 2 Hall (N. Y.), 374.)

It is quite evident from all of the testimony in the instant case that the parties contemplated something more than that the defendant should give his own promissory note unconditionally. The condition was that the note should be bankable either because of the individual responsibility of the maker or of comakers or indorsers. Had they intended otherwise, the word ''bankable'' would not have been employed in the advertisement of the sale. The defendant knew this before he took the cattle away. He was so informed, not only by the printed notice of sale, but by the plaintiff himself. He was told that the note tendered by him would not be accepted unless it was bankable paper, and he undertook to comply with the condition. What is the meaning of the word ''bankable'' in this particular instance? All of the facts and circumstances surrounding the transaction are to be taken into consideration in answering the inquiry. The plaintiff desired to sell his cattle. No discount for cash was to be allowed. Why? Manifestly because it was intended that the cattle should be sold for cash, or its equivalent. The bankable notes, if any were taken, were to be convertible into cash without [3] recourse to the personal responsibility of the individual to whom they were given; that is, the payee or seller of the cattle. It is altogether unreasonable to suppose that the paper was to be made bankable by virtue of the indorsement of the person whose aim was to sell his property for cash.

Was the defendant's individual note bankable? He tacitly [4] admitted that it was not, by his acts and words: (a) He asked Pasha if his note was good. (b) He offered to get his brother to sign it with him in order to make it bankable. (c) After having tendered one note signed by himself alone, he offered to leave the cattle at the ranch until he gave a bankable note. (d) He admitted that his own brother refused to take the responsibility of signing a note with him. (e) He offered to pay for the cattle already butchered and return the others.

(f) He told Pasha that their joint signatures would make the note good. (g) He confessed to Collett that no one would sign the note with him. (h) He admitted that his overdue note, given under similar circumstances, was in the hands of an attorney, unpaid. (i) He told Anderson that Pasha had refused to take his note because it was not bankable. (j) He, in effect, admitted to Anderson that his purpose was not to comply with the terms upon which credit was extended, but that he intended to kill and pay for the cheaper cattle, and force Pasha to take back those of higher price. And he carried out his design so far as he was able. (k) He made no claim that his personal note was bankable paper until he testified at the trial.

But it is said that the testimony of the plaintiff concerning the [5] information received from Cox and Brown, the bankers, was hearsay. As has heretofore been suggested, we think there was sufficient evidence in the record to show that the note was not bankable, without this testimony. The parties evidently had in mind the banks of Bozeman, at which place both did their banking business. Defendant, in effect, so admitted when he testified that his personal notes had always been taken by the Bozeman banks. But was the testimony incompetent? We think not. The conversations related by plaintiff took place in the respective banking houses named by him. Mr. Cox in answering his inquiries was acting officially as cashier of the Commercial National Bank, and Mr. Brown was acting for the National Bank of Gallatin Valley. If the plaintiff had tendered the note to each of the banks and both had refused to purchase it, there can be no doubt that his testimony as to the result of his efforts would have been competent. Mr. Cox spoke for his bank, and Mr. Brown's declarations were those of the bank of which he was the executive officer. Counsel for the appellant says in his brief: "No reason appeared why Mr. Cox and Mr. Brown were not subpoenaed as witnesses. Defendant had a right to cross-examine these witnesses and to have them testify under oath." Had they so testified, upon the theory advanced by the defendant, it could only have been to draw a conclusion whether

or not the note was bankable. But, assuming that such evidence was competent, there is another way of proving the fact; and that is by showing that the banks had actually refused to buy the paper. Their reasons for refusal would be altogether immaterial. In addition to the financial responsibility of the makers or indorsers of commercial paper, there is always the personal equation to be solved,—the question of moral risk. There is also the form of the paper to be taken into consideration, its terms and conditions, the time of payment and rate of interest. Bankers naturally and properly consider all such matters in determining the advisability of buying commercial paper. And, again, the condition of the funds of the bank and the amount of such paper already on hand are things which may be and undoubtedly are necessarily taken into consideration. In times of great financial stress and panic, it often occurs that the banks do not loan any money at all. Under such circumstances even so-called "gilt-edged" paper is not bankable. This condition involves no reflection upon the financial responsibility of the maker or indorser. It is his misfortune. So that we say, under circumstances such as we have under consideration, it is the bank that acts, through its executive officers, and it may exercise its own judgment. Its decision may oftentimes seem arbitrary, but that is its concern. The question at issue was whether the banks had refused to buy the note. Plaintiff asserted that they had. He could testify to the fact of his own knowledge. Such testimony was competent. (*Wallace* v. *Bernheim,* 63 Ark. 108, 37 S. W. 712; *Key* v. *Shaw,* 8 Bing. 560.)

The appellant bases his claim that the note was bankable upon the authority of the case of *E. P. Allis Co.* v. *Madison E. L. H. & P. Co.,* 9 S. D. 459, 70 N. W. 650. The facts in that case were these: The plaintiff sold certain machinery to the defendant for the agreed price of $3,500, payable as follows: $500 in cash and the balance, in equal payments, due in six, twelve, and eighteen months, respectively, all of said deferred payments to be secured by "bankable paper" drawing seven per cent interest. Pursuant to the agreement the defendant sent

to the plaintiff three notes for $1,000 each, due in six, twelve, and eighteen months from the seventeenth day of October, 1889, which notes were signed by J. A. Trow, as surety, and indorsed by the Citizens' National Bank of Madison, in South Dakota. The notes were retained until January 25, 1890, when they were returned as not being bankable paper. The supreme court in its opinion said: "The principal objection is that the court below was not justified in finding that the notes constituted 'bankable paper,' and this contention is based upon the claim that the testimony of Bruce, McKinney, and Baker was incompetent upon the issue of whether or not the notes constituted bankable paper. The witnesses testified that they were engaged in the banking business in Sioux Falls and had been so engaged for a number of years; that they knew the financial standing of Trow and the Citizens' National Bank among bankers; and that the paper in controversy was bankable paper. They were all officers of banks in this state, and were acquainted with the financial standing of Trow and the bank. This rendered them competent to testify as to the character of the paper. It was shown on cross-examination that these gentlemen, as officers of their respective banks, by reason of the stringency of the money market and the demands of their customers, had declined to discount or purchase the paper. But this fact did not render them incompetent to testify as to whether or not the paper was bankable or tend to discredit their evidence on that subject. * * * What, then, was intended by that term in the contract? Evidently paper so secured as to be regarded as bankable paper by banks—first-class paper. We conclude that the term, as used in the contract we are considering, was intended to mean high-credit paper, which, if the time of payment was reasonable and the banks had loanable funds, would be discountable paper. No other meaning could have been intended by either party." Perhaps the foregoing case may be distinguished from the one at bar in the manner of its presentation to the court. As is indicated in the opinion, there was expert testimony that the notes were "bankable paper," while in the case at bar no attempt was made

by the defendant to prove that his note was bankable, aside from his own testimony that the banks had theretofore taken his notes.

But we are unable to concur in the view of the law taken by the South Dakota court. The result of it is that the notes were bankable in theory, but not in fact. The Century Dictionary defines [6] the word "bankable" thus: "Receivable as cash by a bank, as bank notes, checks and other securities for money." It seems to us a contradiction in terms to say that a note which the banks refuse to take is bankable. The words employed should be given a definite meaning in contracts like the one in question. If the parties merely intended, as suggested by the supreme court of South Dakota, that the paper should be "first class" or of "high credit," dependent upon the financial standing of the maker or indorser, they might easily have so declared. The plaintiff was not concerned with the question of the solvency or financial worth of those who were to execute the note. It was his purpose to have the banks determine that matter for themselves. No question of indorsement is in this case. The plaintiff was willing and was required by the contract to accept the unsecured note of the defendant himself, provided it could be disposed of at a bank. It would, in our judgment, be a dangerous doctrine to hold that the bankable character of a piece of commercial paper is dependent upon the subsequently expressed opinions of bankers who have theretofore refused to purchase it; especially in view of the fact, as shown in this case, that the primary object of taking the same was to at once convert it into cash. The acts of refusal to purchase themselves characterized the paper as nonbankable. Paper which the banks refused to purchase is not bankable paper, and that regardless of the reasons for refusal.

We conclude, therefore, that there is ample evidence in the record to justify the finding that the note in question was not bankable in Bozeman. The condition of its acceptance was that it should be convertible into cash. It was not so convertible. Therefore, the condition upon which credit was extended was not fulfilled by the defendant, and plaintiff could sue at once as for cattle sold and delivered.

2. There is some criticism of the findings of fact and conclusions of law. An inspection of the findings heretofore quoted will show that they are somewhat inaccurate in the light of the testimony. But we regard this as immaterial. In substance, they cover all of the issues in the case, and the ultimate conclusion reached by the court is so clearly and manifestly just and right that we are not disposed to regard technical objections with any great degree of favor.

The judgment and order are affirmed.

*Affirmed.*

Mr. Chief Justice Brantly and Mr. Justice Holloway concur.

